## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| JUSTIN K. BLACK, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| THE WEST VIRGINIA STATE POLICE, | ) | 3:22-cv-00096 |
| ANTHONY CUMMINGS, KIMBERLY PACK, | ) | |
| GREG LOSH, MIKE PARDE, | ) | |
| EDDIE BLANKENSHIP, and | ) | |
| UNKNOWN OFFICERS OF THE | ) | |
| WEST VIRGINIA STATE POLICE, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, JUSTIN K. BLACK, by and through undersigned counsel, sues Defendants THE WEST VIRGINIA STATE POLICE, ANTHONY CUMMINGS, KIMBERLY PACK, GREG LOSH, MIKE PARDE, EDDIE BLANKENSHIP, and UNKNOWN OFFICERS OF THE WEST VIRGINIA STATE POLICE, and states the following:

### Introduction

1.      Justin Black spent more than ten years of his life in prison for a crime that he did not commit.

2.      During an overnight interrogation in 2007, Justin told police the truth: he knew nothing about the murder of Deanna Crawford. But investigators ignored his answers and instead pressured Justin improperly for hours, demanding that he falsely confess. Eventually, under extreme psychological duress, the investigators unlawfully overcame his will and Justin signed a fabricated statement. In reality, Justin was entirely innocent.

1

3.      Because of the Defendants' unconstitutional misconduct, Justin was wrongfully convicted and incarcerated for second-degree murder.

4.      Justin's conviction hinged on his coerced and false confession, and on the implausible claims of another man, Brian Dement, who struggled with mental health issues and who later recanted his false allegations. Before interrogating Justin, police had questioned Mr. Dement overnight and extracted three separate statements, all of which spun wildly different tales about the murder, but all of which implicated Justin.

5.      Because Mr. Dement's stories inculpated Justin, the Defendants interrogated Justin and forced him to falsely confess. Ultimately, Justin's coerced confession differed from Mr. Dement's fictional statements. But the Defendants combined the statements of both men to concoct a narrative falsely blaming Justin and Mr. Dement, plus two other innocent men, for the murder.

6.      After he was released from the interrogation, Justin disavowed his false and coerced statement and reaffirmed what he had been trying to tell the interrogators all along: that he was innocent. But the Defendants pursued Justin's prosecution regardless, based only on the dubious false statements that were later recanted by Mr. Dement. As a result of the Defendants' misconduct, Justin was convicted and sentenced to 40 years in prison.

7.      During the decade that followed, Justin professed his innocence from prison. Finally, in 2017, new DNA testing that could not be performed at trial matched the crime scene evidence with the DNA profile of a violent serial rapist then jailed in Ohio. The new DNA evidence provided definitive proof of Justin's innocence.

8.      In 2019, a judge vacated Justin's wrongful conviction. In 2021, the State of West Virginia dismissed charges against Justin, electing not to prosecute him again for the crime he did not commit.

9.      Justin will never regain the time he lost in prison. He now seeks justice and redress for the loss of liberty, hardship, and pain that he continues to suffer due to the Defendants' unconstitutional misconduct.

## Jurisdiction and Venue

10.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution and pursuant to West Virginia law to redress torts committed against Plaintiff.

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367. Venue is proper under 28 U.S.C. § 1391(b) because, upon information and belief, the Defendants reside within this district, and all the events giving rise to the claims asserted herein occurred within the district.

## The Parties

12.     Plaintiff Justin K. Black is 38 years old. At the time of the events giving rise to this complaint, he was a 23-year-old resident of West Virginia.

13.     At all times relevant to this complaint, Defendant Anthony Cummings was a Sergeant with the West Virginia State Police. Defendant Cummings is sued in his individual capacity.

14.     At all times relevant to this complaint, Defendant Cummings acted under color of law and within the scope of his employment.

15.     At all times relevant to this complaint, Defendant Greg Losh was a Trooper with the West Virginia State Police. Defendant Losh is sued in his individual capacity.

16.     At all times relevant to this complaint, Defendant Losh acted under color of law and within the scope of his employment.

17.     At all times relevant to this complaint, Defendant Kimberly Pack was a Trooper with the West Virginia State Police. Defendant Pack is sued in her individual capacity.

18.     At all times relevant to this complaint, Defendant Pack acted under color of law and within the scope of her employment.

19.     At all times relevant to this complaint, Defendant Mike Parde was a Corporal with the West Virginia State Police. Defendant Parde is sued in his individual capacity.

20.     At all times relevant to this complaint, Defendant Parde acted under color of law and within the scope of his employment.

21.     At all times relevant to this complaint, Defendant Eddie Blankenship was a Corporal with the West Virginia State Police. Defendant Blankenship is sued in his individual capacity.

22.     At all times relevant to this complaint, Defendant Blankenship acted under color of law and within the scope of his employment.

23.     At all times relevant to this complaint, Defendants Unknown Officers of the West Virginia State Police were officers with the West Virginia State Police. Defendants Unknown Officers of the West Virginia State Police are sued in their individual capacities.

24.     At all times relevant to this complaint, Defendants Unknown Officers of the West Virginia State Police acted under color of law and within the scope of their employment.

25.     Defendant West Virginia State Police is a state agency that, at all times relevant to this complaint, was the employer of Defendants Cummings, Losh, Pack, Parde, Blankenship, and Unknown Officers of the West Virginia State Police. In addition, at all times relevant to this complaint, Defendants Cummings, Losh, Pack, Parde, Blankenship, and Unknown Officers of the West Virginia State Police acted as agents of the West Virginia State Police. Defendant West Virginia State Police is liable for all torts committed by Defendants Cummings, Losh, Pack, Parde, Blankenship, and Unknown Officers of the West Virginia State Police while they were employed by the West Virginia State Police and acting within the scope of their employment under the doctrine of vicarious liability. The allegations in this complaint against Defendant West Virginia State Police are expressly limited to those found in paragraphs 171-179.

### The Murder of Deanna Crawford

26.     On August 8, 2002, a logging crew discovered the body of 21-year-old Deanna Crawford near an abandoned shed, on an isolated road known as Hickory Ridge in Cabell County, West Virginia. Ms. Crawford was found lying on the ground, facing upward and mostly unclothed. An autopsy determined that Ms. Crawford died from manual strangulation about three to five days before her body was found. Evidence from the scene included a beer can, cigarette butts, and a pair of leopard-print pants that belonged to Ms. Crawford.

27.     The crime scene technician believed, based on the partial nudity and placement of Ms. Crawford's body, that Ms. Crawford had been sexually assaulted. Analysis of the evidence detected male DNA, but the source of the DNA could not be identified.

28.     In the months that followed, investigators interviewed potential suspects and learned that Ms. Crawford had worked as a prostitute. But nearly five years later, the crime remained unsolved.

29.     In January 2007, Defendant Cummings, a West Virginia State Police Sergeant, and Defendant Blankenship, a West Virginia State Police Corporal, interviewed a man named Greg Bailey about the crime. Mr. Bailey, who had a history of drug-related and firearms arrests, told the Defendants that his nephew had talked about murdering a woman with three other men. After interviewing Mr. Bailey, the Defendants gave him a tape recorder so that he could secretly record his conversation with his nephew, 26-year-old Brian Dement, who suffered from bipolar disorder, attention deficit disorder, depression, anxiety, and other cognitive challenges.

30.     During the recorded conversation, Mr. Bailey told his nephew that the police had questioned him, and he suggested to Mr. Dement that other men may have identified Mr. Dement as an accomplice in a prostitute's murder. As their conversation progressed, Mr. Bailey elicited agreement from Mr. Dement that he had indeed witnessed or participated in the crime.

31.     Mr. Bailey delivered the tape recording to the West Virginia State Police, which launched an investigation of Mr. Dement for Ms. Crawford's murder.

### The Interrogation of Brian Dement

32.     On January 28, 2007, Defendant Losh, a West Virginia State Police Trooper, and Defendant Parde, a West Virginia State Police Corporal, entered Mr. Dement's apartment and searched for him. Fearful and confused about why the police would be looking for him, Mr. Dement was hiding in a closet when the Defendants found him. Defendants Losh and Parde handcuffed Mr. Dement and brought him to the police station.

33.     Over the next nine to ten hours, Defendants Cummings, Losh, and Parde goaded Mr. Dement into signing three different statements about Ms. Crawford's murder. Mr. Dement's statements were disjointed and often incoherent. In the first statement, handwritten by Defendant Losh, Mr. Dement claimed he attended a party "a few years ago" with brothers Nathan and

Philip Barnett ("the Barnett brothers") at the home of Justin Black, who suggested they leave the party with Ms. Crawford to "go for a ride." Mr. Dement claimed that the four men left with Ms. Crawford and later, in the car, Phillip Barnett punched her and "dragged her away" with his brother and Justin. Mr. Dement alleged that after Justin and the Barnett brothers returned to the car, Justin drove them back to his house, and Mr. Dement walked to a highway and called a cab to drive him to his uncle's house.

34.     Seven hours later, at 3:33 am, Mr. Dement offered a different narrative in his second statement. This time, Mr. Dement claimed that after Phillip Barnett punched Ms. Crawford, Mr. Dement pulled her out of the car, dragged her down a hill, and then hid while waiting for the other men. Mr. Dement said that after the men drove away, instead of calling a cab, he returned to find Ms. Crawford dead and then walked to his uncle's house – about 17 miles – within "a couple hours."

35.     In the third statement, which was tape recorded at 4:52 am, Mr. Dement's story changed again. In this version, Mr. Dement claimed that after he yanked Ms. Crawford out of the car and Phillip Barnett "commenced to beating on" her, Mr. Dement left and waited, confirmed that Ms. Crawford was dead, and walked to his uncle's house, this time within "three hours or maybe more."

36.     Nothing in any of Mr. Dement's statements was true. All of it was based on what he had been told about the crime by the police and others, and none of it was based on actual personal knowledge.

37.     Aside from their pure falsity, Mr. Dement's statements were plainly inconsistent, offering conflicting details about who hit Ms. Crawford, where Mr. Dement hid while he waited, and how Mr. Dement arrived at his uncle's house. Mr. Dement's statements also did not comport

with the autopsy report, which noted no evidence of fractures or contusions on Ms. Crawford's face or torso.

38.     The Defendants disregarded the glaring inconsistencies in Mr. Dement's false statements and began investigating Justin for the murder.

**The Interrogation of Justin Black**

39.     On January 29, 2007, Justin was at work when his cousin called and said that the police were looking for him. At the time, Justin was twenty-three years old. Justin called Defendant Cummings to ask why the police wanted to speak to him. When Defendant Cummings told him to report to the police station, Justin promptly drove to the station.

40.     At about 7 pm, Justin arrived at the station and was secluded in a room with Defendants Cummings, Losh, and Parde. The Defendants took turns asking Justin about Ms. Crawford's murder. Justin repeatedly asserted, truthfully, that he knew nothing about Ms. Crawford or her murder. This cycle continued for about 20 to 25 minutes.

41.     After it became clear that Justin would not falsely confess, the Defendants changed course. They stopped asking questions and started feeding Justin vivid details about the crime, drawn from the autopsy report and Mr. Dement's false statements. Only the police would have known these details, but the Defendants repeated the details to Justin and demanded that he confirm them. The Defendants also mentioned bits of the storyline that Mr. Dement had manufactured, including the alleged occurrence of the crime after a party at Justin's house, when the four men supposedly went for a ride with Ms. Crawford. These falsehoods were copied straight from Mr. Dement's fabricated statements.

42.     The Defendants communicated these details to Justin to coerce him into falsely confessing.

43.     The Defendants also informed Justin that they knew he was guilty, because Mr. Dement had already told them so, as had the Barnett brothers. In fact, this was a lie; the Barnett brothers had disavowed any involvement in the crime and said they knew nothing about Justin's involvement.

44.     As the Defendants continued to attempt to break his will, Justin continued to maintain his innocence.

45.     When Justin still refused to falsely confess, the Defendants asked him if he would take a polygraph test. Eager to show the police that he was not lying, Justin agreed.

46.     The Defendants then left Justin in a room for about two hours with Defendant Blankenship, a West Virginia State Police Corporal, who watched television while Justin waited for the polygraph. Defendant Blankenship and the other officers at the police station failed to intervene when they witnessed Defendants Cummings, Losh, and Parde attempting to improperly pressure and manipulate Justin into a false confession.

47.     At about 10:30 pm that night, the Defendants returned and confined Justin to a small, cinderblock room in the basement where Defendant Pack, a West Virginia State Police Trooper, began interrogating him. Although Defendant Pack was not licensed to administer a polygraph exam, Defendant Pack administered a polygraph exam to Justin. During the exam, Justin again affirmed his innocence.

48.     After finishing the polygraph, Defendant Pack told Justin that he had failed and demanded that he falsely confess. Bewildered, Justin insisted he had told the truth. In response, Defendant Pack accused Justin of lying. Justin was on parole at the time, and although she had no power over his parole status, Defendant Pack threatened to revoke Justin's parole if he refused to falsely confess. She told Justin that he would lose everything he valued and had

worked to accomplish, including his job, his family, and his college enrollment. Justin, who was

the first person in his family to be accepted into college, became despondent.

49.     Defendant Pack asserted that if Justin agreed to a false confession, then he could

go home, but if Justin did not agree to falsely confess, then he would have to return to prison.

50.     Justin eventually became exhausted from lack of sleep and food. Justin believed

that if he did not falsely confess, the Defendants would not allow him to leave the station and

would instead send him back to prison. Justin panicked at the idea of being caged in a cell again.

51.     Eventually, through unduly coercive means, the Defendants overcame Justin's

will. At 2:11 am on January 30, 2007, as a result of the Defendants' unlawful coercion, Justin

gave a recorded statement to Defendants Cummings and Parde. The Defendants had not recorded

any of the preceding seven hours of interrogation. But when Justin yielded to their demands for a

false confession, the Defendants used a tape recorder to record Justin's statement.

52.     In the recording, Justin used the details about the crime that the Defendants had

repeated to him over the prior several hours. He said that, after a party at his house, he went for a

drive with Mr. Dement, the Barnett brothers, and "the female." Justin's false statement claimed

that "Nathan, Phillip, Brian, Female, got out of the car and they all hit those houses" and that

Justin "got out, stood by the car, used the bathroom, fiddled with the radio and so forth" until the

Barnett brothers returned, and then the three of them left without Mr. Dement or Ms. Crawford.

53.     The Defendants guided Justin during the recording, so that his narrative

corresponded with Mr. Dement's fabricated statements. For instance, when Justin stated that he

and his friends were "being regular teenagers" at the party, Defendant Cummings interjected,

"OK, and on one occasion you end up leaving." Justin replied, "yes." Defendant Cummings then

stated, "In a vehicle," and Justin replied, "yes." After Defendant Cummings asked with whom he

10

left the party, Justin said "Nathan Barnett, Phillip Barnett and Brian." Defendant Cummings then

told him, "OK, and there was a girl in the car also." Justin said "yes."

54.     Defendant Cummings also pushed Justin to provide details about who sat where

in the car, as Mr. Dement had done in his fabricated statements. When Justin said that Nathan

Barnett sat next to him in the front passenger seat, which contradicted Mr. Dement's claims that

Ms. Crawford sat in the front passenger seat, Defendant Cummings asserted, "And then Phillip I

guess would have been in the back." Justin replied, "Yes Phillip in the back, then Brian, then the

female."

55.     The Defendants had obvious reasons to doubt the accuracy of the narrative in

Justin's false confession. The events in Justin's false confession were largely incompatible with

those in Mr. Dement's false statements. Most tellingly, Justin falsely confessed only to driving to

and from the scene of the crime, but not to physically hurting Ms. Crawford. Mr. Dement,

however, alleged that Justin and the Barnett brothers had assaulted the victim, while Mr. Dement

had been a bystander. Even their descriptions of the alleged car differed; Justin described the car

as a "maroon, burgundy" color, while Mr. Dement described the car as "dark blue or black."

56.     Moreover, Justin's false statement did not align with findings in the autopsy

report. Justin claimed he was certain that the party occurred on "July 28" because this was his

friend's birthday, but the autopsy report estimated that Ms. Crawford died no sooner than August

3, 2002. The Defendants also possessed videotape from a store's security camera showing that

Ms. Crawford was alive on the night of August 4, 2002. Thus, the undisputed evidence already

proved that the details in Justin's coerced statement were false.

57.     Nonetheless, Defendants pursued the arrest and prosecution of Justin based on

fabricated evidence.

58.     At 2:40 am, Defendant Parde handwrote Justin's false and coerced statement.
After Justin signed the statement, the Defendants allowed Justin to leave without arresting him.

**Justin and Mr. Dement Disavow Their Coerced Confessions**

59.     About two weeks after his interrogation, Justin returned to the police station and
disavowed his false confession. Justin told Defendant Cummings the truth, explaining that he
had signed a fabricated statement falsely implicating himself.

60.     Justin reiterated to Defendant Cummings that he had been truthful when he told
the Defendants that he knew nothing about Ms. Crawford or her murder.

61.     Defendant Cummings did not take a recorded statement from Justin. Instead,
Defendant Cummings promised that if Justin said the Barnett brothers were guilty of the crime,
then Justin would be given immunity from prosecution. But Justin refused to lie. He again
asserted his innocence and swore he would not fabricate allegations against the Barnett brothers.

62.     After Justin rebuffed his offer, Defendant Cummings handwrote Justin's
recantation. Defendant Cummings did not obtain Justin's signature or tape record the recantation,
even though he had tape recorded Justin's false confession.

63.     In April 2007, the forensic laboratory notified Defendant Cummings that the
DNA profile from the crime scene evidence did not match Justin's DNA profile. The laboratory
had already excluded Mr. Dement and the Barnett brothers as matches for the DNA several
weeks earlier.

64.     The Defendants could not produce any evidence linking Justin to Ms. Crawford's
murder, other than Justin's recanted false confession and Mr. Dement's conflicting false
statements. No physical evidence connected Justin to the crime.

12

65.     The Defendants nevertheless sought to indict Justin. In order to secure the indictment and launch criminal proceedings, the Defendants omitted facts, including that Justin's false confession was unlawfully coerced.

66.     In May 2007, a grand jury indicted Justin, the Barnett brothers, and Mr. Dement, alleging that at some point between August 4, 2002, and August 8, 2002, Justin and the three other men had "jointly" murdered Ms. Crawford. Shortly after the indictment, the West Virginia State Police arrested Justin.

67.     Mr. Dement's inconsistent false confessions and Justin's recanted, fabricated, and coerced confession were used to support the probable cause for Justin's arrest. No other evidence existed to suggest Justin's involvement in the crime.

68.     By delivering Justin's fabricated and coerced confession to the prosecutor as evidence for Justin's indictment, the Defendants set in motion a criminal proceeding entirely unsupported by probable cause.

69.     After the indictment, prosecutors sought to delay the trials of Justin and the Barnett brothers in order to negotiate a plea agreement with Mr. Dement.

70.     In October 2007, Mr. Dement's attorneys agreed to a plea deal, wherein Mr. Dement would plead guilty to second-degree murder and malicious wounding in exchange for the prosecutor's recommendation that he receive a prison sentence of 20 to 24 years.

71.     Two days after entering his plea, Mr. Dement finally admitted to a private investigator that he had fabricated all three of his statements to the police. When asked if Justin or the Barnett brothers were involved in the murder of Ms. Crawford, Mr. Dement said no, answering unequivocally: "We are all innocent."

72.     Mr. Dement told the investigator that when the police arrived at his apartment in January 2007, they "put guns to [his] head." He explained that the police apprehended him "when [he] was intoxicated and messed up" and "got [him] thinking that all this stuff was true." Mr. Dement added that the police lied to him by stating that Justin and the Barnett brothers had already confessed to the crime and had implicated Mr. Dement. Mr. Dement said that he falsely confessed after several hours of unrelenting interrogation by the police.

73.     Mr. Dement also told the investigator that he had tried to tell the truth and recant his false confession with his attorneys and the prosecutor, but they emphasized that he must testify falsely to avoid a longer prison sentence, regardless of his recantation.

74.     On October 29, 2007, in exchange for his guilty plea, a judge sentenced Mr. Dement to 30 years in prison. As part of his plea agreement, Mr. Dement agreed to testify falsely against Justin.

## Justin's Wrongful Conviction

75.     The Defendants' conspiracy to deprive Justin of his constitutional rights continued even after he was indicted.

76.     On April 15, 2008, the first day of Justin's trial, Defendant Cummings falsely testified that Mr. Dement had admitted to participation in the crime "within the first five minutes" of his interrogation. Defendant Cummings also falsely testified that the only inconsistency among Mr. Dement's three statements was his "actual hands-on involvement in [Ms. Crawford's] death."

77.     In addition, both Defendant Cummings and Defendant Parde falsely testified that during Justin's interrogation, they did not feed him details that only the police, the perpetrator, or Mr. Dement (based on his false statements) would know about the crime. Moreover, the

14

Defendants gave their testimony without disclosing – and in fact denying – that Justin's statement was coerced or fabricated by them.

78.     During the trial, several of Justin's current or former friends testified about having been asked by the police about an alleged party occurring at Justin's home in July or August of 2002. Many of these witnesses testified that Defendant Cummings and/or Defendant Parde had contacted them to solicit written statements inculpating Justin.

79.     Some witnesses testified that the Defendants wrote statements that did not accurately reflect the witnesses' answers to the officers' questions. These fabricated statements, which the Defendants had solicited from the witnesses, incriminated Justin at his trial.

80.     Mr. Dement's trial testimony was at least as contradictory as his three prior statements, the inconsistencies of which the Defendants had cast aside.

81.     For instance, Mr. Dement testified that he saw Justin strike Ms. Crawford "in the body." This claim clashed with Mr. Dement's third fabricated statement, in which he said he "didn't see Nathan or Justin hit" Ms. Crawford.

82.     Justin elected to testify on his own behalf. Under oath, Justin again asserted his innocence.

83.     As a direct result of the Defendants' acts of coercion, and their fabrication of false evidence, Justin was convicted of second-degree murder.

84.     In June 2008, at a hearing on Justin's motion for a new trial, Justin produced a note that Mr. Dement had passed to him in jail after the jury reached its guilty verdict. In the note, Mr. Dement again recanted his false statements and wrote: "I wasn't going to do it, but they told [me] [*sic*] if I didn't I would get 50 years." Mr. Dement's recantation was again ignored. The judge denied Justin's motion and sentenced Justin to 40 years in prison.

85.     Justin's wrongful conviction and incarceration were the clearly foreseeable results of his coerced and fabricated confession. Absent the Defendants' unconstitutional misconduct, Justin would not have been prosecuted, convicted, or incarcerated.

### Justin's Exoneration

86.     During his imprisonment, Justin continued to profess his innocence.

87.     In October 2008, Justin appealed his conviction, but the state's appeals court upheld the conviction in 2010. Determined to prove his innocence and uncover the truth about Ms. Crawford's murder, Justin spent the next several years exhausting every possible avenue to be heard.

88.     From 2010 to 2014, Justin filed three *pro se* state petitions and one *pro se* federal petition for a writ of habeas corpus. Justin also filed a *pro se* motion for post-conviction DNA testing and requested the appointment of counsel. In 2014, Justin amended his third state petition and again requested counsel. In April 2015, the Circuit Court found that Justin's amended third state petition "may have grounds for relief" and appointed counsel to represent Justin.

89.     In November 2015, through counsel, Justin filed a second motion for post-conviction DNA testing. In this motion, Justin requested DNA testing on items collected from the crime scene, including cigarette butts and Ms. Crawford's pair of leopard-print pants, using a method of DNA testing not available at the time of trial.

90.     In April 2016, the State filed an answer opposing Justin's motion. The State argued that Justin was not entitled to "any additional DNA testing" of any evidence and contended that an "overwhelming body of non-DNA evidence" connected Justin to the crime.

91.     In opposing DNA testing that would undeniably advance the search for the truth, the State failed to acknowledge that the only evidence linking Justin to the murder were the false,

inconsistent, and frequently recanted statements of Mr. Dement, whom the State knew to suffer

from learning disabilities, substance use disorder, and mental illness. Aside from Mr. Dement's

statements, the prosecution had relied exclusively upon Justin's coerced and recanted confession.

92.     In September 2016, the Circuit Court granted Justin's motion for the new DNA

testing, mandating that any results be uploaded to the Combined DNA Index System ("CODIS")

database, and entered more orders for DNA testing in November 2016 and April 2017.

93.     In August 2017, the new DNA testing detected semen on the interior crotch of

Ms. Crawford's leopard-print pants. The analysis of the DNA profile from the semen excluded

Justin, the Barnett brothers, and Mr. Dement as matches for the DNA. In October 2017,

additional testing revealed that the DNA profile obtained from the leopard-print pants matched

the DNA profile obtained from cigarette butts collected at the crime scene.

94.     In November 2017, the West Virginia State Police Forensic Laboratory notified

the state police and the prosecuting attorney's office that the DNA profile from both the pants

and the cigarette butts matched the DNA profile of a man named Tim Smith, a convicted sex

offender who was incarcerated in Ohio, but who had lived near the crime scene when the murder

occurred.

95.     Justin and his counsel remained uninformed about this new exculpatory evidence

for about seven months. In the meantime, Justin filed another petition to vacate his conviction.

96.     In February 2018, Defendants Parde and Losh visited Tim Smith, the source of

the DNA, in prison. The Defendants told Mr. Smith about the discovery of his DNA on the

cigarette butts and on Ms. Crawford's pants, but assured Mr. Smith that the state police had

already convicted four men of the murder many years ago.

17

97.    During the subsequent four months, corroborating evidence that incriminated Mr. Smith began to surface, including evidence that he violently abused his wives and children and that he raped a 12-year-old girl.

98.    On May 31, 2018, more than half a year after learning of the match, the State finally informed Justin and his counsel about the DNA evidence that exonerated Justin and inculpated Mr. Smith. Justin continued fighting to overturn his conviction, citing the newly disclosed evidence.

99.    On May 1, 2019, the Circuit Court finally vacated Justin's conviction, entitling him to a new trial.

100.    On October 5, 2021, the State announced its decision to dismiss charges against Justin, electing not to try him again for the murder of Ms. Crawford.

**Mr. Black's Damages**

101.    For more than ten years, Mr. Black was forced to live in prison for a crime he did not commit.

102.    During his wrongful incarceration, Mr. Black was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to pursue a career and to share holidays, funerals, weddings, births, and other momentous life events with loved ones, and he was deprived of the fundamental freedom to live his life as an independent person.

103.    The consequences of Mr. Black's wrongful conviction are lasting and profound. Mr. Black will never regain the time he lost, and he will always grapple with the emotional scars of his wrongful imprisonment.

104.    Mr. Black has suffered tremendous damage, including psychological trauma and emotional suffering, solely because of Defendants' misconduct.

### Count I – 42 U.S.C. § 1983
### Coerced Confession in Violation of the Fifth Amendment

105.    Each paragraph of this complaint is incorporated as if restated fully herein.

106.    As described more fully above, Defendants Cummings, Losh, Pack, Parde, and Unknown Officers of the West Virginia State Police, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, forced Plaintiff to incriminate himself falsely and against his will, in violation of his rights secured by the Fifth Amendment.

107.    As described more fully above, the Defendants conducted an unconstitutionally coercive interrogation of Plaintiff that overbore his will and that caused Plaintiff to make an involuntary false statement implicating himself in a crime he did not commit: the murder of Deanna Crawford.

108.    The Defendants used threats, promises, and other calculated pressure tactics to elicit an involuntary, false statement from Plaintiff. Defendants' misconduct caused Plaintiff's false confession. The coerced, involuntary, and false statement that the Defendants fabricated and attributed to Plaintiff was used to Plaintiff's detriment in a criminal case.

109.    The Defendants' misconduct, as described in this Count, was objectively unreasonable and undertaken intentionally, with malice and reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

110.    The Defendants' misconduct, as described in this Count, shocks the conscience.

111.    Because of Defendants' misconduct as described in this Count, Plaintiff suffered injuries, including but not limited to loss of liberty, mental anguish, humiliation, degradation,

physical injury and sickness, emotional pain and suffering, and other severe and continuing injuries and damages as set forth more fully above.

112.     The Defendants' misconduct, as described in this complaint, resulted in Plaintiff's unjust and wrongful conviction and his wrongful loss of liberty and imprisonment, and denied Plaintiff his rights as protected by the Fifth Amendment to the United States Constitution.

### Count II – 42 U.S.C. § 1983
### Coerced Confession and False Arrest in Violation of the Fourth Amendment

113.     Each paragraph of this complaint is incorporated as if restated fully herein.

114.     As described more fully above, Defendants Cummings, Losh, Pack, Parde, and Unknown Officers of the West Virginia State Police, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, forced Plaintiff to give a coerced and false confession.

115.     As described more fully above, the Defendants conducted an unconstitutionally coercive interrogation of Plaintiff, during which they questioned Plaintiff for several hours overnight, from early evening into early the next morning, without sleep or food. The interrogation of Plaintiff, during which the Defendants used threats, inducements, and manipulative pressures, was so inherently coercive that Plaintiff could not exercise mental freedom when the interrogation's full coercive force was brought to bear on him.

116.     In order to justify Plaintiff's arrest, the Defendants omitted material facts, including that Plaintiff's confession was coerced and fabricated, with reckless disregard for whether the arrest warrant was misleading as a result. When viewing all evidence available to them, Defendants had obvious reasons to doubt the accuracy of the arrest warrant and the information contained therein, including Plaintiff's coerced and fabricated confession and its

inconsistencies with the autopsy report, the videotape evidence showing the victim still alive after the alleged party, and the fabricated and inconsistent statements of Mr. Dement.

117.     Plaintiff's coerced and false confession, and the misrepresentations contained in in Plaintiff's arrest warrant, were material to the finding of probable cause for Plaintiff's arrest.

118.     The Defendants used Plaintiff's coerced and fabricated confession as justification to arrest Plaintiff without probable cause, in violation of his rights as secured by the Fourth and Fourteenth Amendments.

119.     The conviction and imprisonment of Plaintiff were reasonably foreseeable results of the coerced and fabricated confession and the false arrest. Absent the Defendants' misconduct, the arrest of Plaintiff would not have been executed, the prosecution of Plaintiff would not have been pursued, and Plaintiff would not have been convicted.

120.     The misconduct described in this Count was objectively unreasonable and undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

121.     Because of Defendants' misconduct as described in this Count, Plaintiff suffered injuries, including but not limited to loss of liberty, mental anguish, humiliation, degradation, physical injury and sickness, emotional pain and suffering, and other severe and continuing injuries and damages as set forth more fully above.

122.     The Defendants' misconduct, as described in this complaint, resulted in Plaintiff's wrongful arrest, wrongful loss of liberty, and wrongful conviction and imprisonment, in violation of his rights as protected by the Fourth and Fourteenth Amendments to the United States Constitution.

**Count III – 42 U.S.C. § 1983**
**Federal Malicious Prosecution Under the Fourth and Fourteenth Amendments**

123.    Each paragraph of this complaint is incorporated as if restated fully herein.

124.    As described more fully above, a criminal proceeding was initiated and continued against Plaintiff. The prosecution of Plaintiff was initiated and maintained without probable cause to believe that Plaintiff committed the crime.

125.    As described more fully above, Defendants Cummings and Parde, while acting under color of law and within the scope of their employment, made, influenced, or participated in the decision to initiate the criminal prosecution against Plaintiff by coercing his false confession and fabricating evidence.

126.    As described more fully above, the Defendants fabricated evidence and supplied false or misleading information that was material to the finding of probable cause for Plaintiff's indictment and prosecution, including but not limited to the coerced and false confession of Plaintiff and the inconsistent and fabricated statements of Mr. Dement, to the prosecutor and grand jury, in order to obtain the indictment, prosecution, and conviction of Plaintiff.

127.    When viewing all evidence available to them, as more fully described above, the Defendants had obvious reasons to doubt the accuracy, and were aware of the probable falsity, of the false or misleading information described above, based on the inconsistencies within the coerced and false statements of Plaintiff and Mr. Dement, the recantations of Plaintiff and Mr. Dement, and the absence of verifiable, corroborating, or physical evidence implicating Plaintiff in the crime.

128.    By supplying the false or misleading information as described above, while aware of its probable falsity, to secure the indictment and prosecution of Plaintiff, Defendants acted with reckless disregard for whether they misled the prosecutor and grand jury.

22

129.     In addition, Defendants testified falsely with reckless disregard for the truth at Plaintiff's criminal trial. As a result of the Defendants' false testimony about fabricated evidence – including their testimony that Plaintiff's confession was not coerced or fabricated – the criminal proceeding against Plaintiff continued. Absent Defendants' misconduct, Plaintiff would not have been indicted, prosecuted, or convicted of the crime of murder.

130.     The criminal proceeding was resolved in Plaintiff's favor when his conviction was vacated, and the charges were dismissed.

131.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and reckless disregard for the truth, and with willful indifference to Plaintiff's clearly established constitutional rights.

132.     As a result of Defendants' misconduct, Plaintiff suffered injuries, including but not limited to loss of liberty, mental anguish, humiliation, degradation, physical injury and sickness, emotional pain and suffering, and other severe and continuing injuries and damages as described more fully above.

133.     The misconduct described in this Count deprived Plaintiff of his right to be free from malicious prosecution as secured by the Fourth and Fourteenth Amendments of the United States Constitution.

## Count IV – 42 U.S.C. § 1983
## Violation of Due Process Under the Fourteenth Amendment

134.     Each paragraph of this complaint is incorporated as if restated fully herein.

135.     As described more fully above, Defendants Cummings and Parde, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional rights to due process and a fair trial.

136.     As described more fully above, the Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, fabricated police reports and other material evidence, including Plaintiff's coerced and fabricated confession and Mr. Dement's fabricated and false statements, in violation of Plaintiff's clearly established right not to be deprived of liberty as a result of an investigating officer's fabrication of evidence.

137.     Plaintiff's conviction and incarceration were the reasonably foreseeable results of the Defendants' initial acts of fabrication, including but not limited to Plaintiff's coerced and false confession.

138.     The misconduct described in this Count was objectively unreasonable and undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

139.     The Defendants' misconduct resulted in the unjust and wrongful criminal conviction of Plaintiff and his wrongful imprisonment and denied Plaintiff his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

140.     Because of Defendants' misconduct as described in this Count, Plaintiff suffered injuries, including but not limited to loss of liberty, mental anguish, humiliation, degradation, physical injury and sickness, emotional pain and suffering, and other severe and continuing injuries and damages as set forth more fully above.

141.     The Defendants' misconduct, as described in this complaint, resulted in the unjust and wrongful criminal conviction of Plaintiff and his wrongful imprisonment, thereby denying

him his rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

### Count V – 42 U.S.C. § 1983
### Failure to Intervene

142.     Each paragraph of this complaint is incorporated as if restated fully herein.

143.     As described more fully above, by their conduct and under color of law, during the constitutional violations described herein, Defendant Blankenship and one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, despite having a reasonable opportunity to do so.

144.     As a direct and proximate result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty, mental anguish, humiliation, degradation, physical injury and sickness, emotional pain and suffering, and other severe and continuing injuries and damages as set forth above. Defendants had reasonable opportunities to prevent these injuries, but they failed to do so.

145.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

146.     The Defendants' misconduct, as described in this complaint, resulted in the unjust and wrongful criminal conviction of Plaintiff and his wrongful imprisonment, thereby denying him his rights as secured by the Fifth and Fourteenth Amendments to the United States Constitution.

### Count VI – 42 U.S.C. § 1983
### Civil Conspiracy to Deprive Constitutional Rights

147.     Each paragraph of this complaint is incorporated as if restated fully herein.

148.     As described more fully above, Defendants Cummings, Losh, Pack, Parde, Blankenship, and Unknown Officers of the West Virginia State Police, while acting under color of law and within the scope of their employment, agreed among themselves and with other individuals to act in concert in order to deprive Plaintiff of his constitutional rights, including his rights under the Fourth, Fifth, and Fourteenth Amendments, all as described in the various paragraphs of this complaint set forth above.

149.     As described more fully above, Defendants watched an open breach of the law, including but not limited to Defendants' unconstitutionally coercive interrogation of Plaintiff, but did nothing to seek its prevention. In this manner, the failure of one or more of the Defendants to intervene to prevent the violation of Plaintiff's constitutional rights constituted a step taken in furtherance of a civil conspiracy to deprive Plaintiff of his constitutional rights under the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

150.     In the manner described above, in furtherance of the conspiracy, each of the Defendants engaged in and facilitated numerous overt acts, including but not limited to those set forth above — such as coercing Plaintiff to make a false confession, wrongfully arresting him, and fabricating false evidence — and was an otherwise willful participant in joint activity.

151.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

152.     The Defendants' agreement and actions in furtherance of the conspiracy directly and proximately caused the violation of Plaintiff's constitutional rights. As a result of Defendants' agreement and actions in furtherance of the conspiracy, Plaintiff suffered injuries, including but not limited to loss of liberty, mental anguish, humiliation, degradation, physical

injury and sickness, emotional pain and suffering, and other severe and continuing injuries and damages, as described more fully above.

## Count VII – State Law Claim
### Malicious Prosecution

153.    Each paragraph of this complaint is incorporated as if restated fully herein.

154.    As described more fully above, Defendants Cummings and Parde, while acting individually, jointly, and/or in conspiracy, pursued and caused the prosecution of Plaintiff by coercing him to make false confession, falsely arresting him, and supplying the prosecutor with inconsistent and fabricated statements to secure Plaintiff's indictment, with reckless disregard for whether the fabricated statements were misleading.

155.    Based on the facts, circumstances, and evidence available to them, as more fully described above, the Defendants could not have reasonably believed that Plaintiff was guilty of the crime, and they could not have reasonably believed that probable cause existed to prosecute Plaintiff for the crime.

156.    In addition, as described above, Defendants Cummings and Parde testified falsely, with reckless disregard for the truth, at Plaintiff's criminal trial.

157.    The criminal prosecution of Plaintiff was initiated without probable cause and continued without probable cause.

158.    On October 5, 2021, the criminal proceeding terminated in Plaintiff's favor, when the charges against Plaintiff were dismissed.

159.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and with willful indifference to Plaintiff's clearly established constitutional rights.

160.     As a result of Defendants' misconduct, Plaintiff suffered injuries, including but not limited to loss of liberty, mental anguish, humiliation, degradation, physical injury and sickness, emotional pain and suffering, and other severe and continuing injuries and damages, as described more fully above.

### Count VIII – State Law Claim
### Intentional Infliction of Emotional Distress

161.     Each paragraph of this complaint is incorporated as if restated fully herein.

162.     As described more fully above, Defendants Cummings, Losh, Pack, Parde, and Unknown Officers of the West Virginia State Police, while acting individually, jointly, and/or in conspiracy, subjected Plaintiff to an unconstitutionally coercive interrogation, forced him to make a false and involuntary statement implicating himself in a crime he did not commit, used Plaintiff's coerced and false confession and other fabricated evidence to wrongfully arrest him, and used his coerced and false confession and other fabricated evidence to obtain Plaintiff's indictment and prosecution. The Defendants' misconduct caused Plaintiff to be wrongfully convicted and imprisoned for a crime he did not commit.

163.     The Defendants' misconduct was so extreme and outrageous that it exceeded generally accepted standards of decency, such that it was utterly intolerable in a civilized society. Because of Defendants' misconduct, which caused Plaintiff's wrongful conviction and incarceration, Plaintiff suffered severe emotional distress that no reasonable person could be expected to endure.

164.     The misconduct described in this Count was undertaken with malice, intentionally, and recklessly, such that Plaintiff's emotional distress was certain or substantially certain to result from the misconduct.

165.     As a result of Defendants' misconduct, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional pain and suffering, as described more fully above.

## Count IX – State Law Claim
## Civil Conspiracy

166.     Each paragraph of this complaint is incorporated as if restated fully herein.

167.     As described more fully in the preceding paragraphs, Defendants Cummings, Parde, and other known and unknown co-conspirators acted in concert with one another and conspired by concerted action to accomplish an unlawful purpose by unlawful means.

168.     In furtherance of the conspiracy, the Defendants committed overt, wrongful acts, including but not limited to the malicious prosecution of Plaintiff, which caused Plaintiff's wrongful conviction, and the intentional infliction of emotional distress upon him, as described more fully above.

169.     The misconduct described in this Count was undertaken intentionally, willfully, and with malice.

170.     As a result of the Defendants' misconduct, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional pain and suffering, as described more fully above.

## Count X – State Law Claim
## Vicarious Liability

171.     Each paragraph of this complaint is incorporated as if restated fully herein.

172.     In committing the acts alleged in the previous paragraphs, Defendants Cummings, Losh, Pack, Parde, and Unknown Officers of the West Virginia State Police were employees and

agents of Defendant West Virginia State Police, acting at all relevant times within the scope of their employment and under color of law.

173.     Defendant West Virginia State Police is liable as the principal for all torts committed by its agents.

### Count XI – State Law Claim
### Indemnification

174.     Each paragraph of this complaint is incorporated as if restated fully herein.

175.     Defendant West Virginia State Police is a state agency that, at all times relevant to this complaint, employed Defendants Cummings, Losh, Pack, Parde, Blankenship, and Unknown Officers of the West Virginia State Police.

176.     Under West Virginia law, a state agency that has purchased liability insurance may pay a judgment for damages awarded against an officer or employee of the state agency as a result of a civil action for injuries caused by the officer or employee while acting in the course of employment and within the scope of his or her authority.

177.     On information and belief, Defendant West Virginia State Police has undertaken to purchase liability insurance in order to indemnify its employees and agents against such civil judgments.

178.     Defendants Cummings, Losh, Pack, Parde, and Unknown Officers of the West Virginia State Police were employees and agents of the West Virginia State Police, acting at all times within the scope of their employment in committing the misconduct described herein.

179.     Defendant West Virginia State Police is obligated to pay any judgment entered against Defendants Cummings, Losh, Pack, Parde, and Unknown Officers of the West Virginia State Police, under and up to the limits of Defendant West Virginia State Police's liability coverage.

WHEREFORE, Plaintiff, JUSTIN K. BLACK, respectfully requests that this Court enter judgment in his favor and against Defendants WEST VIRGINIA STATE POLICE, ANTHONY CUMMINGS, KIMBERLY PACK, GREG LOSH, MIKE PARDE, EDDIE BLANKENSHIP, and UNKNOWN OFFICERS OF THE WEST VIRGINIA STATE POLICE, awarding compensatory damages, costs, and attorneys' fees against each Defendant, along with punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate.

## Jury Demand

Plaintiff, JUSTIN K. BLACK, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.


Respectfully submitted,


/s/ Elizabeth Paukstis
Attorney for Justin Black

Elizabeth Paukstis, *Pro Hac Vice Pending*
D.C. Bar ID # 1601418
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, Illinois 60607
Phone: (202) 306-9779
Fax: (312) 243-5902
Paukstis@Loevy.com

/s/ Lonnie C. Simmons
Attorney for Justin Black

Lonnie C. Simmons (W.Va. I.D. No. 3406)
DIPIERO SIMMONS MCGINLEY &
BASTRESS, PLLC
P.O. Box 1631
Charleston, West Virginia 25326
Phone: (304) 342-0133
Fax: (304) 342-4605
Lonnie.Simmons@dbdlawfirm.com